## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

**REGINE MALEBRANCHE SMITH,**

   **Plaintiff,**

**v.**                                    **CASE NO.: 3:12-cv-211-MW/CJK**

**SACRED HEART HEALTH SYSTEM,
INC.**

   **Defendant.**
_____/

## PLAINTIFF'S RESPONSE AND MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO STRIKE PLAINTIFF'S AFFIDAVIT

Plaintiff, REGINE MALEBRANCH SMITH, through her counsel, files her Response and Memorandum in Opposition to Defendant's Motion to Strike her affidavit filed in support of her Response in Opposition to Defendant's Motion for Summary Judgment [Doc. 67] and states the following:

### I. GENERAL STANDARD FOR STRIKING AFFIDAVIT TESTIMONY

As a preliminary matter, at least one Judge in this District has determined that motions to strike such as the one filed by Defendant are "time wasters" because this Court is fully equipped to make determinations as to whether or not an affidavit complies with the requirements under Rule 56 upon its review of the filed materials. See Ex. A, Order Denying Motion to Strike, Hume v. Bobbin Trace Automotive, LLC, Case No. 4:10cv572-RH (N.D. Fla. Aug. 17, 2011)(J. Hinkle). Other courts in this Circuit agree. See Purdee v. Pilot Travel Centers, LLC, 2009 WL 423976 at *1 (S.D. Ga Feb. 19, 2009)("To be sure, motions to strike are generally disfavored by the Court and are often considered time wasters.")(quoting Vaughn v. City of Orlando, 2008 WL

3540434 at *2 (M.D. Fla. 2008)).   Further, "motions to strike are disfavored and infrequently granted." Id. (citing Thompson v. Kindred Nursing Ctrs. E., LLC, 211 F.Supp.2d 1345, 1348 (M.D. Fla. 2002)).

An affidavit submitted in connection with a summary judgment proceeding should not be stricken if it measures up to the standards of Rule 56(e) of the Federal Rules of Civil Procedure. Barnebey v. E.F. Hutton & Co., 715 F. Supp. 1512 (M.D. Fla. 1989); 6 Moore's Federal Practice P56.22 (1974).  An affidavit must be stricken only "if it is a conclusory argument rather than a statement of fact, or when the affidavit is not based on personal knowledge." Johnson v. Scotty's Inc., 119 F.Supp. 2d 1276, 1281 (M.D. Fla. 2009). A motion to strike will "usually be denied unless the allegations have no possible relation to the controversy and may cause prejudice to one of the parties." Story v. Sunshine Foliage World, Inc., 120 F.Supp. 2d 1027, 1030 (M.D. Fla. 2000)(quoting Seibel v. Society Lease, Inc., 969 F.Supp. 713, 715 (M.D. Fla. 1997)).

Rule 401, Federal Rules of Evidence, provides for the admissibility of any evidence that is relevant if it "has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  This standard is "extremely liberal." Douglass v. Eaton Corp., 9556 F.2d 1339, 1344 (5th Cir. 1992).  Further, in employment discrimination cases, a blanket exclusion of evidence can be particularly damaging because:

> plaintiffs must face the difficult task of persuading the fact-finder to disbelieve an employer's account of its own motives. . . Circumstantial proof of discrimination typically includes unflattering testimony about the employer's history and work practices - evidence which in other kinds of cases may well unfairly prejudice the jury against the defendant.  In discrimination cases, however, such background evidence may be *critical* for the jury's assessment of whether a given employer was more likely than not to have acted from an unlawful motive.

Estes v. Dick Smith Ford, Inc., 856 F.2d 1097, 1103 (8th Cir. 1988).  Additionally, even if the

Court finds that one or more of the sentences disputed by Defendant are deficient and should be stricken, the appropriate remedy is to strike only the deficient portions. See Lee v. National Life Assurance Co. of Canada, 632 F.2d 524 (5th Cir. 1980); Hollander v. American Cyanamid Co, 172 F.3d 192, 198 (2nd Cir. 1999); Evans v. Technologies Application & Serv. Co., 80 F.3d 954, 962 (4th Cir. 1996); Casas Office Machines, Inc. v. Mita Copystar American, Inc., 42 F.3d 668, 682 (1st Cir. 1994).

## II. PLAINTIFF'S AFFIDAVIT CONSISTENT WITH HER DEPOSITION TESTIMONY

The courts have recognized that "to allow every failure of memory or variation in a witness' testimony to be disregarded as a sham would require far too much from lay witnesses and would deprive the trier of fact of the traditional opportunity to determine which point in time and with which words the affiant . . . was stating the truth." Tippens v. Celotex Corp., 805 F.2d 9494, 953-54 (11th Cir. 1986).   Therefore, the courts distinguish between discrepancies that create transparent shams and discrepancies that create an issue of credibility or go to the weight of the evidence. See id.; see also, Strickland v. Norfolk Southern Railway Co., 692 F.3d 1151, 1160-61 (11th Cir. 2012)(same); Rollins v. TechSouth, Inc., 833 F.2d 1525, 1531 (11th Cir. 1987)(same).

Defendant claims that Plaintiff's affidavit is inconsistent, and even contradictory to her deposition testimony; however, Defendant fails to specifically state in what ways the listed paragraph numbers are contradictory.  Rather, Defendant simply posits a chart for Plaintiff and this Court to discern how or in what way Defendant discerns these alleged contradictions.  This is the job of the Defendant – it is not up to the Plaintiff to guess what allegations are waged against her.  However, Plaintiff maintains that there are no such contradictory statements that

warrant striking any of the individual paragraphs.[1]

Paragraph 10:
Coordinators serve as a role model and have supervisory duties that are not tasked to other RNs; however, all nurses are held to the same standard of care for patients, and must abide by Sacred Heart's policies and procedures.

Deposition Testimony, pp. 46-47:
Q:      And so that the Coordinators were held to a higher standard than the RN's that you supervised?
A:      Yes.
Q:      And why is that?
A:      You are the role model.  You are there to guide them and how can you expect more from them if you're not doing what you're supposed to do.

There is no contradiction between Plaintiff's Affidavit, paragraph 10 and her deposition testimony.  Plaintiff testified that supervisors are held to a higher standard as role models.  She never testified that supervisors were subjected to different set of rules, regulations, policies, procedures, or standard of care than other nurses.

Paragraph 11:
I occasionally helped out on day shift due to staffing issues; the differences between the two shifts include that the number of surgeries were typically higher during the day, requiring different staffing ratios, and dealing with more staff associated with the same; both shifts handled patient discharges, though there may have been more during the day. However, from a nursing perspective or even a Coordinator perspective, the positions were essentially the same.

Deposition Testimony, pp. 50-51:
Q:      Any other differences between the two shifts?
A:      In a nursing point of view, not really because what you do during the day you do also during the night, assuring that the patient is stable.
...
A:      It's still guidance and, no, I don't see a lot of differences between the responsibilities we had on day shift or night shift.
Q:      Now, when you say you don't see a lot, that tells me that you recognize there are some differences between the day shift Coordinator's role and the night shift Coordinator's role.
A:      There would be some because during the day shifts they had to interact

---

[1]       For the convenience of the Court, Plaintiff's Affidavit is attached hereto as Exhibit B; the cited deposition testimony is attached hereto as Exhibit C.

> with much more other staff than us; many more nurses coming on the floor, many more therapists coming on the floor, many more doctors coming on the floor that we did not have to deal with that as much on the night shift.

There is no contradiction between Plaintiff's Affidavit, paragraph 11 and her deposition testimony.

> Paragraph 12:
> While working under Gambino, she repeatedly treated me different than my white co-workers and subordinates in terms of discipline, targeting me for the same and culminating in my suspension, demotion, and ultimately, my termination.
>
> Deposition Testimony:

Defendant cites to sixteen pages of Plaintiff's deposition (pp. 60-76) as being contradictory to this statement in her affidavit. However, a review of these pages demonstrate that Plaintiff testified as to Gambino subjecting her to a series of undeserved disciplinary actions after the Plaintiff reported Bare's insubordination.

> Paragraph 15:
> In my deposition, I was questioned about a line in a letter I sent to FCHR that stated I did not say anything about discrimination while I was still employed. As I testified to in my deposition, I do not know why I wrote that to the FCHR because I know that I told Brown and the CEO that I was being treated differently. [Ex. 2, Plaintiff's Depo at 56-57].
>
> Deposition Testimony:

As for paragraph 15 of Plaintiff's Affidavit, she actually cites to her deposition and it states the same thing as her deposition. Likewise, paragraphs 13, 14, and 36 all relate to Plaintiff's reporting of different treatment at the hands of Gambino. Presumably, Defendant is taking issue with the fact that it did not like her response at her deposition, nor in her affidavit, but this does not make it contradictory. Moreover, her letter to the FCHR was not sworn testimony.

Paragraph 19:

Bare, meanwhile, was never disciplined for her insubordination. She was only told to verbally apologize to me. Based on the intensity of Bare's aggression, let alone the fact that she treated me with utter contempt in front of all the other nurses on the shift, she should have been written up. Further, I had previously complained about Bare's insubordination approximately one month earlier – nothing was done at that point in time either.

Deposition Testimony p. 98:

Q:    Why did you put that you were the only one reprimanded when that's not true? [regarding Plaintiff's Responses to Interrogatories]

A:    To me, it is true. To me, this – from this, everything was worse. It was a reprimand to me.

Q:    How was it a reprimand?

A:    To me, it was a reprimand. To me, it was a joke. Everybody knew about it. Everybody knew about it. Robin was not suspended, and to me it was a slap in the face. It was humiliating and it was a reprimand, sir.

There is no contradiction between Plaintiff's Affidavit, paragraph 19 and her deposition testimony. To Plaintiff's personal knowledge, the meeting that she attended resulted in no disciplinary action against Bare – she was simply told to apologize to Plaintiff. Further, as Plaintiff pointed out in her Statement of Facts, Bare was not disciplined for this insubordination. [Doc. 65 at 21, ¶43].

Paragraph 22:

On or around April 2010, Plaintiff complained to Gambino that Suzanne Rodgers was not arriving on time for rounding at the beginning of the shift despite Gambino's mandate regarding the same; some days Rodgers refused to do rounds at all. Instead of reprimanding Rodgers, Gambino reprimanded me on June 25, 2010 for not providing Rogers with the rounding of the patients, also referred to as a "report" of the patients' conditions. Actually, I did not refuse to provide the report to Rogers, I was preparing all of the information at the end of the shift change so I could provide her with a complete reporting. Further, the reprimand states that I acted rude and unprofessionally, which I also deny. At no time was I rude or unprofessional to Rogers.

Deposition Testimony:

The pages cited by Defendant, pp. 106-110, clearly show that Plaintiff's testimony is completely consistent with the paragraph above. However, it also shows how Defendant's counsel was completely argumentative with the Plaintiff, characterizing the reprimand as a failure to answer a

question, when in reality, the Plaintiff was attempting to explain that rounding and reporting are the same exact thing and the providing of the status of the patients at the end of the shift is "reporting" or "rounding."  Moreover, Plaintiff did not author the reprimand.

Paragraph 23:
My reports of errors on Medication Administration Records (MARs) by nurses and coordinators to Gambino and the ERS System were routinely ignored.  For example, I reported inaccuracies on MARs by Jennifer June to Gambino, but my complaints were ignored. However, when Jake Bush allegedly reported the same types of inaccuracies and errors, it became the subject of an immediate investigation and topic of a staff meeting. Issues raised by me were not handled in such a professional, expedient manner.

Deposition Testimony pp. 153-54:
Q:      And then your incident that you reported and nobody got back with you, what was the medication error?
A:       I had several.
Q:       What were the medication errors?
A:      I had a med that we are not giving at the right time.  I had a med that was never reported.  The nurse signed the MAR saying that the MAR was accurate and the med was not on the MAR. I had a mistake where the patient was given the medicine too early.  I had – I definitely had a mistake on the wrong time, wrong dosage, the medicine not being there, and I can't remember all of them.
Q:      So how is that you can sit here under oath and say that the situation with Jake Bush was the same as what you reported?
A:      I did not say that it was the same.  I said a med error.  It was – I remember it was a med error and I do now that I have reported med errors.

There is no contradiction between Plaintiff's Affidavit, paragraph 23 and her deposition testimony.  Her testimony clearly states that she was referring to her reporting of medication errors; counsel for Defendant attempted to limit this to the same exact type of medication error in her deposition, but this was not her testimony.  Her testimony, in both her affidavit and her deposition testimony concern the reporting of medication errors generally.

Paragraph 24:
I reported various clinical errors, such as Rogers failing to pierce an antibiotic bag for a patient; however, Gambino failed to follow up in a constructive manner.  Rather, when I was walking down the hall, I overheard Gambino tell Rogers that I was complaining

about her, that I said she failed to properly administer the antibiotic, Gambino told Rogers not to worry about it.

Deposition Testimony p. 81:
A:        I do not recall any at this time, sir.
...
A:        I don't remember anything – or any other one at this time.
...
A:        I did report what I remembered.  If I – at this time I don't remember.  If someone said something, I might recall something else.

There is no contradiction between Plaintiff's Affidavit, paragraph 24 and her deposition testimony.  Plaintiff testified that she stated all incidents that she could recall at that time; if Defendant believes she has now recalled additional incidents, this does not create an inconsistency.

Paragraph 25:
I also reported various record keeping errors, including serious errors involving narcotic medication, but Gambino failed to follow up with the staff; however, my record keeping was scrutinized for even typos.  For example, I reported Jennifer June and Susan Parello failing to process a cardiology consult; June reporting inaccurate patient weight which affects the calibration of medicines; Robin Bare administering hypertensive medicines too early without checking the patient's blood pressure; and Bonnie Brock misclassifying patients.

Deposition Testimony:  See quoted portions of p. 81, and response, above.

The above citations demonstrate that there are no contradictions between Plaintiff's affidavit and her deposition testimony.  Defendant's exaggerated claim that Plaintiff's affidavit is in wholesale conflict with her deposition testimony lacks merit, and as such, hardly warrants a striking of Plaintiff's affidavit, let alone refusal to consider the evidence contained within the affidavit.  See Strickland v. Norfolk Southern Railway Co., 692 F.3d 1151, 1160-61 (11th Cir. 2012); see also Tippens v. Celotex, 805 F.2d 949, 955 (11th Cir. 1986).

## III. **PLAINTIFF'S AFFIDAVIT BASED ON PERSONAL KNOWLEDGE**

Defendant argues that seven paragraphs of Plaintiff's affidavit are heresay statements and should be stricken by this Court. Plaintiff disagrees – each of these statements were made directly to her or in her presence, accordingly, she has personal knowledge of the statements.

Defendant takes a very narrow view of what constitutes personal knowledge. "According to the Federal Rules of Evidence, personal knowledge can be established by showing that the witness was in a physical position to see, hear, or otherwise perceive the matters to which the testimony relates." Johnson v. Scotty's, Inc., 119 F.Supp.2d 1276, 1281 (M.D. Fla. 2000)(citing Fed.R.Evid. 602). Plaintiff has testified to what she observed and saw during the time that she was an employee of the Defendant. All of these paragraphs are based on Plaintiff's personal knowledge; she was either the recipient of the information, observed the action, or was in meetings wherein the information was exchanged. A statement of fact based on the affiant's personal knowledge and observations is admissible as evidence. See Fed.R.Civ.P. 56; see also Davis v. Valley Hospitality Services., LLC, 372 F. Supp. 2d 641, 653 (M.D. Ga. 2005)(refusing to strike witnesses' observations because they were opinions rationally based on her perceptions of the events); Hughes v. Amerada Hess Corp., 187 F.R.D. 682, 686 (M.D. Fla. 1999)(statements in affidavits not stricken where they related to the circumstances surrounding the plaintiff's employment of which she had personal knowledge); Wigley v. R&D Maintenance Serv., Inc., 2009 WL 2151148 at *5 (S.D. Ala. July 15, 2009)(declarations based on witnesses' personal observations and experiences not stricken).

Further, paragraphs 21, 23, and 33 relate to Plaintiff's conversations with authority figures at the hospital, such as the house supervisor, and other employees during the course of the employment. A "statement offered against an opposing party [that] was made by the party's

agent or employee on a matter within the scope of that relationship and while it existed," however, is excluded from the definition of hearsay. Fed.R.Evid. 801(d)(2)(D); see also, Zaben v. Air Prods. & Chems., Inc., 129 F.3d 1453, 1456 (11th Cir. 1997); Ash v. Sambodromo, LLC, 676 F.Supp.2d 1360, 1372 (S.D. Fla. 2009); Molodecki v. Robertson Display, Inc., 2002 WL 34421226 at *2-3 (M.D. Fla. 2002)(statements made by plaintiff's boss and "other employees" of defendant in transcript of tape-recorded conversation with plaintiff were admissions by party opponent).

Paragraph 34 concerns Plaintiff's feelings at the time of her suspension, as well as those provided for the purpose of medical treatment; accordingly, this statement falls under at least two exceptions to the hearsay rule: then existing mental, emotional, or physical condition; and statements for purposes of medical diagnosis or treatment.  Fed.R.Evid. 803(3), (4).

Further, as to Defendant's editing of Paragraph 21, implying that Plaintiff, was discussing Robin Bare yelling at a supervisor, she was not.  She was referring to the fact that Elizabeth Masoner told the Plaintiff directly that she received a level II disciplinary action after Masoner yelled at her supervisor.  This testimony is contained in Plaintiff's deposition as well.  See Ex. C, Plaintiff's Depo at 85-86.

Finally, this Court is permitted to consider statements that may constitute hearsay in ruling on a motion for summary judgment if the statement can be reduced to admissible evidence at trial.  See Wajnstat v. Oceania Cruises, Inc., 2011 EL 2746235 at *1 (S.D. Fla. July 14, 2011)(citing Macuba v. Deboer, 193 F.3d 1316, 1323 (11th Cir. 1999).  Plaintiff maintains that should this Court find any of the challenged statements in Plaintiff's affidavit to constitute hearsay in that form, all such statements can be – and will be – reduced to admissible evidence at trial and therefore should be considered when rendering an opinion on the pending motion for

summary judgment.

## IV. PLAINTIFF'S AFFIDAVIT NOT CONCLUSORY

Plaintiff acknowledges the general rule is that "conclusory allegations without specific supporting facts have no probative value." Leigh v. Warner Bros., Inc., 212 F. 3d 1210, 1217 (11th Cir. 2000). However, personal knowledge can include inferences and opinions as long as they are grounded in observation or first-hand experience. See Fed.R.Evid. 701, 704; see also Visser v. Packer Eng'g Assoc., Inc., 924 F. 2d 655, 659 (7th Cir. 1991)). The paragraphs cited by Defendant are based on Plaintiff's observations, and the facts underlying the disciplinary actions she received and her ultimate termination. See Fed.R.Civ.P. 56; see also Davis v. Valley Hospitality Services., LLC, 372 F. Supp. 2d 641, 653 (M.D. Ga. 2005)(refusing to strike witnesses' observations because they were opinions rationally based on her perceptions of the events); Hughes v. Amerada Hess Corp., 187 F.R.D. 682, 686 (M.D. Fla. 1999)(statements in affidavits not stricken where they related to the circumstances surrounding the plaintiff's employment of which she had personal knowledge). All of the challenged statements in this section are based on Plaintiff's observations and her opinions and inferences drawn therefrom and accordingly should not be stricken or disregarded upon review of the submitted materials.

## V. CONCLUSION

Defendant's Motion should be denied for the reasons stated herein.

Respectfully submitted
/s/ James Garrity
James Garrity [FBN 0539211]
MARIE A. MATTOX, P.A.
310 East Bradford Road
Tallahassee, Florida 32303
(850) 383-4800 (telephone)
(850) 383-4801 (facsimile)

ATTORNEYS FOR PLAINTIFF

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished  by CM/ECF to all counsel of record  this 1st day of April 2013

/s/  James Garrity
James Garrity

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

AMY L. HUME,

      Plaintiff,

v.                                                           CASE NO.  4:10cv572-RH/WCS

BOBBIN TRACE AUTOMOTIVE,
L.L.C., etc.,

      Defendant.

_____/

## ORDER DENYING THE MOTION TO
## STRIKE THE PLAINTIFF'S AFFIDAVIT

    This is a gender-discrimination and sexual-harassment case.  The defendant
has moved for summary judgment.  The plaintiff has filed her own affidavit in
opposition.  The defendant has moved to strike parts of the affidavit.

    The affidavit includes testimony on matters within the plaintiff's personal
knowledge but also includes conclusions that have no place in an affidavit.  And, at
least according to the defendant, some of the affidavit testimony contradicts the
plaintiff's own deposition testimony.  That the defendant takes exception is hardly
surprising.

But motions to strike like this one are time wasters.  The point of the endeavor is to correctly resolve the summary-judgment motion based on the evidence properly in the record under Federal Rule of Civil Procedure 56.  The defendant may address any matters of consequence in its reply memorandum in support of the summary-judgment motion.  In deciding that motion, I will ignore the plaintiff's conclusions and will properly apply the law on contradictions between a person's affidavit and deposition testimony.  But separately addressing the motion to strike point by point would serve no purpose.

Accordingly,

IT IS ORDERED:

The motion to strike, ECF No. 30, is DENIED.

SO ORDERED on August 17, 2011.

Robert L. Hinkle
United States District Judge

# EXHIBIT B

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**

**REGINE MALEBRANCHE SMITH,**

      **Plaintiff,**

**v.**                            **CASE NO.: 3:12-cv-211-MW/CJK**

**SACRED HEART HEALTH SYSTEM,**
**INC.**

      **Defendant.**

_____/

**AFFIDAVIT OF REGINE MALEBRANCHE SMITH IN OPPOSITION TO**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

STATE OF FLORIDA
LEON COUNTY

       BEFORE ME personally appeared REGINE MALEBRANCHE SMITH, who, after taking an oath states the following on her own personal knowledge:

      1.     My name is Regine Malebranche Smith and I am the Plaintiff in this case.  I am a black female over eighteen years of age.

**BACKGROUND**

      2.     I am a registered nurse; I obtained my certification in 1994.

      3.     I was employed with Defendant Sacred Heart Health System, Inc. (Sacred Heart) from July 1999 to August 2010.  I found out on August 23, 2010 that I was terminated and that they made they retroactively made the effective date as July 23, 2010.

      4.     At the time of my termination, I was employed as the WOW Night Coordinator of the Observation Department.  "WOW" stands for "work on weekends" but this specific unit is closed on Sunday so I was typically assigned to special days during the week.  We worked

twelve (12) hour shifts; it was a seventy-two (72) hour position bi-weekly.  The Observation Unit is essentially the post-operative unit.

5.      I was on medical leave for approximately six months while undergoing chemotherapy, from on or around September 2008 until March or April of 2009.

6.      When I went out on medical leave, Angela Land was my supervisor; when I returned Jeanne Gambino was my supervisor.

7.      In working under Gambino, she unfairly targeted me for discipline, treating me different than the white nurses.  Gambino's campaign of trumped up discipline against me resulted in my suspension and ultimately, my termination.

8.      I was the only black Coordinator in the unit – day or night shift. In fact, I was the only black nurse in the entire unit – including day shift and night shift.

## WORKING UNDER GAMBINO

9.      As the Coordinator, I supervised the night shift nurses and technicians in the unit. The number of employees I supervised depended on how many patients we had on the floor.  I would assign the nurses, including myself, to particular patients and provide guidance regarding medical care.

10.      Coordinators serve as a role model and have supervisory duties that are not tasked to other RNs; however, all nurses are held to the same standard of care for patients, and must abide by Sacred Heart's policies and procedures.

11.      I occasionally helped out on day shift due to staffing issues; the differences between the two shifts include that the number of surgeries were typically higher during the day, requiring different staffing ratios, and dealing with more staff associated with the same; both shifts handled patient discharges, though there may have been more during the day.  However,

2

from a nursing perspective or even a Coordinator perspective, the positions were essentially the same.

12.     While working under Gambino, she repeatedly treated me different than my white co-workers and subordinates in terms of discipline, targeting me for the same and culminating in my suspension, demotion, and ultimately, my termination.

13.     I reported the discriminatory treatment under Gambino while I was still employed to Pat Brown in Human Resources.  I did not tell Brown that Gambino was racist or use the legal word "discrimination" but I told her explicitly that Gambino was treating me different than the other nurses and Brown seemed to understand.

14.     I also reported this discriminatory behavior to the COO of Sacred Heart while I was out in suspension, as noted in paragraph 36, below.

15.     In my deposition, I was questioned about a line in a letter I sent to FCHR that stated I did not say anything about discrimination while I was still employed.  As I testified to in my deposition, I do not know why I wrote that to the FCHR because I know that I told Brown and the CEO that I was being treated differently. [Ex. 2, Plaintiff's Depo at 56-57].

*Robin Bare's Insubordination*

16.     On or about February 26, 2010, at the nurses station, Robin Bare started yelling at me, calling me incompetent.  Bare was an RN, subordinate to me.  She was yelling over and over again to the point of her face turning red.  Jake Bush and several other nurses and employees were at the station at the time.  I did not want to engage or escalate the situation, so I walked away.  I reported Bare's behavior to Gambino in writing immediately following the incident.  Gambino told me that there are two sides to each story and she needed to ask Bare what happened.

3

17.     I was called to Brown's office together with Gambino and Bare.  I told Brown

that I felt like I was being treated differently.  I even went back to Brown's office and told her

that "something was going on" and asked her to "please help me" as the situation was becoming

unbearable.  I told her that I was being "treated in a way that I did not deserve to be treated and I

felt like she was treating me differently than the other people."

18.     At the meeting, wherein I thought Bare would be disciplined for her

insubordination, the topic actually turned to false allegations against me.  Bare stated that I had

forged another nurse's name on a document; while she was making these accusations, Gambino

just sat there and said nothing.  Following the meeting, I emailed Gambino several times about

this issue.  She finally responded (after a delay) with the name of the patient whose

documentation I allegedly forged, but not a copy of the document.  I called medical records to

obtain the documents myself and reviewed the same to ensure there were no irregularities, which

there were not.  I never forged another nurse's name on that document – or any other document.

Gambino never met with me regarding this allegation.

19.     Bare, meanwhile, was never disciplined for her insubordination.  She was only

told to verbally apologize to me.  Based on the intensity of Bare's aggression, let alone the fact

that she treated me with utter contempt in front of all the other nurses on the shift, she should

have been written up.   Further, I had previously complained about Bare's insubordination

approximately one month earlier – nothing was done at that point in time either.

20.     At the meeting Gambino or Brown stated that both of us were equally responsible

for the incident. It was disrespectful and demeaning to accused of being equally culpable.

21.     However, another RN, Elizabeth Masoner, told me that she yelled at her white

coordinator and received a level II disciplinary action.

4

*Plaintiff's Reports of Employees' Violations Ignored*

22.     On or around April 2010, Plaintiff complained to Gambino that Suzanne Rodgers was not arriving on time for rounding at the beginning of the shift despite Gambino's mandate regarding the same; some days Rodgers refused to do rounds at all. Instead of reprimanding Rodgers, Gambino reprimanded me on June 25, 2010 for not providing Rogers with the rounding of the patients, also referred to as a "report" of the patients' conditions. Actually, I did not refuse to provide the report to Rogers, I was preparing all of the information at the end of the shift change so I could provide her with a complete reporting.  Further, the reprimand states that I acted rude and unprofessionally, which I also deny.  At no time was I rude or unprofessional to Rogers.

23.     My reports of errors on Medication Administration Records (MARs) by nurses and coordinators to Gambino and the ERS System were routinely ignored.  For example, I reported inaccuracies on MARs by Jennifer June to Gambino, but my complaints were ignored. However, when Jake Bush allegedly reported the same types of inaccuracies and errors, it became the subject of an immediate investigation and topic of a staff meeting.  Issues raised by me were not handled in such a professional, expedient manner.

24.     I reported various clinical errors, such as Rogers failing to pierce an antibiotic bag for a patient; however, Gambino failed to follow up in a constructive manner.  Rather, when I was walking down the hall, I overheard Gambino tell Rogers that I was complaining about her, that I said she failed to properly administer the antibiotic, Gambino told Rogers not to worry about it.

25.     I also reported various record keeping errors, including serious errors involving narcotic medication, but Gambino failed to follow up with the staff; however, my record keeping

5

was scrutinized for even typos.  For example, I reported Jennifer June and Susan Parello failing to process a cardiology consult; June reporting inaccurate patient weight which affects the calibration of medicines; Robin Bare administering hypertensive medicines too early without checking the patient's blood pressure; and Bonnie Brock misclassifying patients.

### Dilaudid Incident

26.     On June 11, 2010, I assisted Clevetta Herndon, an RN (white), in disposing of the remaining dilaudid (a narcotic) in a patient's IV bag.  I took the bag to the nurses station and per protocol, I emptied the liquid drug into a cup and washed it down the sink – Herndon observed and monitored this entire process as it requires two signatures to sign off on the disposal, or "waste" of a narcotic.  After I disposed of the drug, I threw the empty IV bag into the trash.

27.     The following week, on or around June 15, 2010, I was called into Brown's office and told that trash services recovered the IV bag from the trash and it contained liquid in it still. I was shocked because I know that I emptied and wasted all of the drugs.  Brown told me that both Herndon and me were being placed on suspension pending an investigation. I was told not to speak to Herndon during the investigation and that I was not to return to the floor.

28.     As detailed below, I was re-suspended after the initial suspension was lifted, and eventually terminated; Herndon, however, kept her job and was not subject to a "re-suspension." I deny that I committed any wrongdoing and properly disposed of all of the drugs remaining in the bag.

### Gambino's Discrimination Towards Others

29.     One evening, Gambino came to the nurses station and told us that a black CNA technician, Beverly Grandison, had called the HR hotline and reported Gambino for treating her badly.  Gambino seemed to mock her complaints and I thought it was inappropriate to share a

confidential hotline complaint with the employees.  Gambino went on to say, 'can you believe she called the hotline about me?' and then laughed about the situation.

30.     At a Coordinators Meeting, Gambino told me and several other nurses about the alleged drug addiction problems suffered by a Latina nurse, Alba Nieves.  It was highly personal, sensitive information and I felt like it was completely inappropriate for her to be sharing this information with others.  Gambino spoke about this very serious situation in a joking manner.

31.     I don't recall Gambino discussing such information about white employees.  I reported Gambino's inappropriate behavior regarding Nieves to Brown.

## SUSPENSION

32.     After my initial suspension for approximately ten (10) days, I was brought back to work and told that they were stripping me of my coordinator duties and moving me to the day shift, which meant a cut in pay on both accounts since coordinators earn more than regular RNs and the night shift earns an upwards pay differential per hour.  At no time was I told that I would keep my same wages despite these two changes to my duties and shifts.

33.     At this same meeting, on June 25, 2010, they handed me a corrective action alleging seven (7) separate incidents going back to May 4, 2010.  Prior to June 25, 2010, I was not verbally counseled regarding these events, nor did anyone address these issues with me.

- (1) 5/4/10, ERS System:  I did not enter inappropriate ERS entries; the purpose of the system was to report medical care issues in order to find potential defects in the care process and find opportunities to improve our services.  I believed that my reports in the ERS system were appropriate to further this goal.  I even followed up with Devries regarding certain issues and entries on my own.

- (2) 5/18/10, Bonnie Brock:  I did not call in a replacement for Brock because we were sufficiently staffed to meet the guidelines for the nurse to patient required ratio.  I did give my report to Rodgers on my patient as well as inform her that Brock called off when she started the assignments.

7

- (3) 5/25/10, Suzanne Rodgers: I was at no time rude or unprofessional. I did not refuse to provide the report to Rogers, I was preparing all of the information at the end of the shift change so I could provide her with a complete reporting.

- (4) 5/14/10, Dr. Sangosanaya: I have no recollection of any such incident involving me and I think the patient was actually assigned to another nurse. I asked Gambino and Brown for documentation regarding this alleged event, but they never provided me any documentation. As such, I deny this in its entirety.

- (5) 5/22/10, Dr. Tugwell: This is not true; I did change the dressing with the assistance of another nurse. I have never seen any documentation stating that Dr. Tugwell was upset.

- (6) 5/24/20, ACT Team: I actually reported this incident because Jennifer June failed to call in the consult and never told me to do so. It is untrue that I was informed to call it in; however, after doing rounds, I checked the chart and saw the consult in the computer and consulted with Herndon as to whether the cardiologist had been on the floor, which he had not, so then I called it in.

- (7) 6/5/10, Patient Complaint: I was not rude or unprofessional to this patient at any time. I did not give her pain medication because it was not yet time for her to receive the medicine – I was following protocol. I spoke to Dr. Altenhofen and he was satisfied with the care this patient received. I also spoke to Cindy (house supervisor) about this particular patient and she stated that she was satisfied with my job performance with this patient.

34.    When I was given this write up, accusing me of things I did not do, together with the demotion and cut in pay, I knew Gambino was purposefully trying to make me quit. I was so distraught over this situation that I went to my doctor, who medically excused me from work based on the amount of stress I was under. I felt betrayed by the hospital after I had provided almost eleven years of service; I was not treated the same as other nurses and employees.

35.    While out on sick leave, on or around July 20, 2010, I returned to Sacred Heart to meet with Brown and Gambino; they told me that the lab results came back positive for 30 ml of

Dilaudid in the IV bag and that I was re-suspended. Brown then told me that I should just resign because it was likely that I would be terminated, but that they would call me with the final determination as to my status.

36.     While out on suspension, after not receiving any word from Sacred Heart as to whether I still had a job, I wrote the COO, Ms. Schmidt on August 9, 2010, to tell her of the discriminatory actions taken against me and that I was being treated differently than the other employees.

**TERMINATION**

37.     On August 23, 2010, I received a letter from Sacred Heart dated August 19, 2010, stating that I was terminated and the effective date was retroactive to July 23, 2010.

38.     This correspondence claims that I was supposed to meet with Brown and Gambino on July 23, 2010, but I failed to show up. This is not true. I was never told to meet them on that particular date and was waiting to be contacted by Brown regarding the status of my continuing suspension. Gambino alleged that she texted me on my phone to attend this meeting, but this is completely false; I never received a text message from her.

39.     Sacred Heart is supposed to have a progressive disciplinary policy wherein employees are first counseled, then receive level I discipline for subsequent infractions, then to level II, and then suspension and possibly termination. At the time of my suspension I had one pending corrective action given to me on April 26, 2010, the next one I received from Gambino was on June 15, 2010 when I was put on suspension pending the investigation of the Dilaudid incident. Then, when I came to meet Brown and Gambino regarding the status of my suspension, I was handed the retro-active corrective action on June 25, 2010. Prior to the April disciplinary action from Gambino, I had not received any discipline in approximately six years.

9

In fact, in my entire career at Sacred Heart, prior to April 2010, I had a total of four corrective actions given to me, and two of those were for tardy violations early in my tenure.

40.     Further, as to the April 26, 2010 corrective action, I disputed (and continue to dispute) the syringe allegation and requested additional information regarding the other two allegations, but Gambino never followed up with me.  The "antidotal" incidents listed were never presented to me as counseling issues; I filed an amendment to the medical record within twenty four (24) hours on the insulin order and I accidentally checked the box for "crib" instead of "bed" on the form which was an obvious typo because the patient was an adult male regarding the documentation issue.

- 3/30/10:  While it is possible I made a mistake on the room number or the blood sugar, I asked for documentation regarding the same and it was never provided.  I do not understand the issue with the patient and the doctors, nor do I recall this being an issue.

- 3/20/10:  I at no time left syringes in a room.

- 3/06/10:  I have no recollection of this event – and did not at the time this corrective action was given to me.  I asked Gambino for the patient's name so I could review the records, but she never followed up with me.

41.     Prior to receiving the termination letter on August 23, 2010, I had been qualified for certain medical tests and procedures through Blue Cross and Blue Shield on August 6, 2010; in other words, they approved insurance coverage for the procedure on this date.  I had the procedure on August 17, 2010, and it was still under insurance approval.  I did not receive notice of my COBRA rights until September 21, 2010; this notice stated that my benefits were terminated as of July 31, 2010 based on the alleged July 23, 2010 termination date.

42.     I believe people should be treated the way they perform and I felt like I was treated differently.  And other than my color and my race and my accent, I don't see what would

10

be the other reason why I was treated differently.

43.    After I was terminated, I learned that Peggy Masoner (white) had been promoted to my position, the night Coordinator WOW position.

Dated this ___5___ day of __February__ 2013

Regine Malebranche Smith

## **ATTESTATION**

BEFORE ME personally appeared Regine Malebranche Smith, who, after being sworn, states that the facts set forth above are true and correct and are on her own personal knowledge. She presented her Florida driver's license as proof of her identity.

JANESTHER J. CANNON
MY COMMISSION # DD 967649
EXPIRES: March 4, 2014

Notary Public (Signature)

_____
Notary Public (Printed Name)
My Commission expires:

# EXHIBIT C

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

REGINE MALEBRANCHE SMITH,

          Plaintiff,

Vs.                              Civil Action No.
                                 3:12-CV-211/MCR/CJK

SACRED HEART HEALTH
SYSTEM, INC.,

          Defendant.



_____/

DEPOSITION OF REGINE MALEBRANCHE SMITH

October 1, 2012

          Taken by the attorney for the Defendant
at the offices of Celeste Phelps, Court Reporter,
located at 226 South Palafox Place, Suite 201,
Pensacola, Florida, commencing at 9:00 AM, before
Mary H. Brigman, Court Reporter and Notary Public.

## CELESTE PHELPS

Court Reporting Services
Suite 201, Seville Tower
226 Palafox Place
Pensacola, Florida 32502
(850) 436-2618
Fax (850) 436-7738

2

1

2

<u>APPEARANCES</u>

3    FOR THE PLAINTIFF:

4

5            TIFFANY CRUZ, ESQUIRE
             (Appearing for)
6            JAMES GARRITY, ESQUIRE
             Marie A. Mattox, PA
7            310 East Bradford Road
             Tallahassee, Florida 32303

8

9

     FOR THE DEFENDANT:
10

11

12           ERICK M. DRLICKA, ESQUIRE
             JOSEPH A. PASSERETTI, ESQUIRE
             Emmanuel, Sheppard & Condon
13           30 South Spring Street
             Pensacola, Florida 32502
14

15

     Also Present:
16

17

             JEANE GAMBINO - Sacred Heart Rep
18

19

20

21

22

23

24

25

MARY BRIGMAN, COURT REPORTER

3

1

## INDEX OF TRANSCRIPT

2

3    WITNESS:   REGINE MALEBRANCHE SMITH

3                                                          Page No.

4    Direct Examination by Mr. Drlicka...........4

5                           EXHIBITS

6    Defendant's Exhibit No. 1...................13

7    Defendant's Exhibit No. 2...................16

8    Defendant's Exhibit No. 3...................20

9    Defendant's Exhibit No. 4...................23

10   Defendant's Exhibit No. 5...................26

11   Defendant's Exhibit No. 6...................34

12   Defendant's Exhibit No. 7...................43

13   Defendant's Exhibit No. 8...................47

14   Defendant's Exhibit No. 9...................48

15   Defendant's Exhibit No. 10..................51

16   Defendant's Exhibit No. 11..................54

17   Defendant's Exhibit No. 12..................79

18   Defendant's Exhibit No. 13..................97

19   Defendant's Exhibit No. 14.................101

20   Defendant's Exhibit No. 15.................106

21   Defendant's Exhibit No. 16.................120

22   Defendant's Exhibit No. 17.................121

23   Defendant's Exhibit No. 18.................173

24

25

MARY BRIGMAN, COURT REPORTER

4

```
 1              P R O C E E D I N G S
 2    WHEREUPON:
 3         REGINE MALEBRANCHE SMITH
 4    was called as a witness, and after having been
 5    first duly sworn, was examined and testified as
 6    follows:
 7              DIRECT EXAMINATION
 8    BY MR. DRLICKA:
 9         Q.    Can you please state your name?
10         A.    Regine Malebranche Smith.
11         Q.    And what is your current address?
12         A.    4407 Eastpointe Drive.
13         Q.    East --
14         A.    Eastpointe.
15         Q.    Eastpointe, okay.
16         A.    Pensacola, Florida 32514.
17         Q.    And how long have you lived there,
18    approximately?
19         A.    About 13 years now -- 12 years.
20         Q.    And do you live there -- who have you
21    lived there with in the past, let's say, since
22    2008?  Besides yourself, who's lived at that
23    address with you?
24         A.    My kids, my husband and I.
25         Q.    And your husband's name?
```

1    I always kept, I don't remember how many patients,

2    but I had patients also.

3        Q.    Other than supervising the nurses and

4    the techs underneath you on your shift and then

5    assigning -- making appropriate assignments to the

6    nurses on your shift, what other responsibilities

7    did you have as a Coordinator?

8        A.    According to this sheet, whatever was on

9    the sheet I just followed it.

10       Q.    Do you recall any other responsibilities

11   that you had?

12       A.    At this time, no.

13       Q.    And how did your responsibilities as a

14   Coordinator differ from the nurses who were

15   underneath you that you supervised?

16       A.    I feel like as a Coordinator I had to

17   guide them, give them guidance, making decisions

18   and just making sure that the shift went smoothly.

19       Q.    And did you feel at the time that you

20   were Coordinator at Sacred Heart that being in that

21   leadership role that you should serve as a role

22   model to the people that you supervised?

23       A.    Definitely.

24       Q.    And so that the Coordinators were held

25   to a higher standard than the RN's that you

MARY BRIGMAN, COURT REPORTER

1   supervised?

2       A.      Yes.

3       Q.      And why is that?

4       A.      You are the role model.  You are there

5   to guide them and how can you expect more from them

6   if you're not doing what you're supposed to do.

7       Q.      Let me show you Exhibit Number 8 and

8   just let me know when you're ready.

9       A.      Uh-huh, okay.

10      Q.      Do you recognize this is a job

11  description for an RN position WOW II full-time?

12      A.      Uh-huh.

13      Q.      And do you agree with the job summary,

14  job requirements and job relations that are listed

15  on the first page of Exhibit 8?  It's kind of the

16  same question I asked you about Exhibit 7, but I'm

17  just like cutting to the chase on it.

18      A.      Uh-huh, yes.

19          MR. DRLICKA:  All right, let's take a

20      few-minute break.  We've been going an hour

21      and this is a good place.  And if you need a

22      break during the deposition, please ask me.

23          THE WITNESS:  Thank you.

24          MR. DRLICKA:  We have plenty of time

25      today, and we're actually moving along at a

1   discharges occurring during the day shift than the

2   night shift?

3       A.      I would think so.

4       Q.      Any other differences between the two

5   shifts?

6       A.      In a nursing point of view, not really

7   because what you do during the day you do also

8   during the night, assuring that the patient is

9   stable.

10      Q.      And that's a good point.  How about as

11  far as differences in what Coordinators had to do

12  in the day shift versus the night shift?

13      A.      It's still guidance and, no, I don't see

14  a lot of difference between the responsibilities we

15  had on day shift or night shift.

16      Q.      Now, when you say you don't see a lot,

17  that tells me that you recognize there are some

18  differences between the day shift Coordinator's

19  role and the night shift Coordinator's role.

20      A.      There would be some because during the

21  day shifts they had to interact with much more

22  other staff than us; many more nurses coming on the

23  floor, many more therapists coming on the floor,

24  many more doctors coming on the floor that we did

25  not have to deal with that as much on the night

1   shift.

2        Q.    Any other differences in the role of the

3   day Coordinator and the Night Coordinator?

4        A.    I cannot recall all the differences

5   right now.  I would have to sit down and think

6   about all the differences.

7        Q.    But you recognize that because of what's

8   going on throughout the day -- strike that.

9              You recognize that what goes on

10  throughout each shift is different between the

11  night and the day shift?

12       A.    I would think so.

13       Q.    Let me show you what will be marked as

14  Exhibit 10.

15       A.    I do recognize that.

16       Q.    And is that your signature at the bottom

17  of Exhibit 10?

18       A.    It is.

19       Q.    And when you signed Exhibit 10, did you

20  understand that you were signing it under the

21  penalty of perjury and that you were declaring that

22  you had read the Complaint of Discrimination and

23  that the facts stated in it are true?

24       A.    Yes.  Perjury mean again?  I'm sorry.

25       Q.    Lying.

1    the record, please?

2         A.      I felt discriminated against several

3    times but I did not say anything due to fear of

4    retaliation.  I have witnesses --

5         Q.      I just needed that one sentence.

6         A.      Uh-huh.

7         Q.      So you are telling the Florida

8    Commission on Human Relations on November 7th that

9    you never reported any discrimination?

10        A.      Uh-huh.

11        Q.      Was that a true statement?

12        A.      I did not -- when I said that I felt

13   that I should have -- probably I should have --

14   hold on.  I was only -- why did I say I never

15   because I had a paper -- I had the letter.  I had

16   the letter and it was -- when you send it

17   registered letter to the -- I do not know why I

18   said that because I sent a letter, a registered

19   letter.  I don't remember the date of that letter.

20        Q.      To whom?

21        A.      To the CEO, or CO, or something.

22        Q.      Ms. Schmidt?

23        A.      Ms. Schmidt, yes.

24        Q.      And in that letter did you anywhere say

25   that you believed that you were the victim of race

1  discrimination?

2      A.      I don't -- do you have the copy of the

3  letter?

4      Q.      I'm asking you do you recall sitting

5  here today --

6      A.      I recall stating to her that I felt like

7  I was treated differently.

8      Q.      I didn't ask whether you said you were

9  treated differently.  I asked a very simple

10  question.  In the letter to Ms. Schmidt did you

11  ever allege that you were the victim of race

12  discrimination?

13      A.      I don't remember.

14      Q.      Yes or no?

15      A.      I do not remember.

16      Q.      But you would agree --

17      A.      I would like to review that letter

18  and --

19      Q.      We'll get there.

20      A.      Uh-huh.

21      Q.      But you would agree that that letter was

22  before this letter of November 7, 2010 to the

23  Florida Commission on Human Relations that is

24  marked as Exhibit Number 11?  You had already

25  written that letter to Ms. Schmidt that you're

60

1      A.      I cannot remember numbers, but --

2      Q.      How many can you remember?

3      A.      I cannot remember numbers.

4      Q.      You can't remember one incident?

5      A.      But I -- one incident of --

6      Q.      How many incidents can you --

7              MS. CRUZ:  Let her answer the question.

8   BY MR. DRLICKA:

9      Q.      How many incidents can you remember that

10  you claim that you were retaliated against?

11     A.      Okay, actually I'm not understanding

12  your question.  Are we talking about the

13  retaliation or are we talking right now about the

14  way I felt when I reported something to Jeane

15  Gambino and she did not report back to me or tell

16  me -- is that the question?

17     Q.      I am asking you about your factual basis

18  for why you feel you were retaliated against, and

19  my question was how many times.  You couldn't

20  remember the number.  So my next question to you,

21  which is this one, is how many incidents of

22  retaliation do you recall?

23     A.      The retaliation?

24     Q.      Yes.

25     A.      I felt that after I reported some

MARY BRIGMAN, COURT REPORTER

1    practices on the floor coming from Jeane Gambino to

2    Ms. Pat Brown, when I felt like Ms. Brown was

3    understanding what I was -- I reported to her, and

4    right after that everything became worse and worse.

5    So one of that retaliation was after I reported all

6    the practices that I felt was unfair and wrong.

7        Q.     And what are you claiming was the

8    retaliation?

9        A.     The retaliation is that right after that

10   then I started receiving -- I received disciplinary

11   action.  I worked at Sacred Heart over ten years

12   and I never had one disciplinary action in my file.

13       Q.     Not one?

14       A.     Not one disciplinary action in my file

15   in over ten years, sir.

16       Q.     When did you make this report to Pat

17   Brown?

18       A.     After we -- we had the incident where a

19   nurse, Robin Bare, was yelling at me, I wrote a

20   letter to report what happened and I was expecting

21   something to be done about it.  And we were called.

22   Robin Bare and I and Jeane Gambino, we were called

23   to Ms. Brown's office and we were -- all three of

24   us were there.  And Robin Bare was just saying some

25   stuff that I did not really comprehend.  She was

1    saying that I falsified a document.  I did not know

2    nothing about falsifying a document.  And I said,

3    what is she talking about?  And I was expecting

4    Ms. Gambino to say, Robin, what are you talking

5    about?  And I felt like if Robin had the nerve to

6    be saying those things in the presence of Jeane,

7    that Jeane had a lot to do with this.  Jeane was

8    probably the one passing the information to Robin

9    Bare.

10            So at that point I asked -- I started

11   sending some e-mails to Jeane Gambino telling her

12   that, Jeane, I need to have more information about

13   the cases that Robin Bare brought up in that

14   meeting because I do not know anything about it.

15   It took several e-mails asking for information

16   until she finally sent it.

17            When finally I had that, I went back to

18   Ms. Brown and I said, Ms. Brown, I really feel

19   like -- I'm sorry, can you repeat your question?

20   When did I feel the retaliation, was that the

21   question?

22       Q.    I don't know.  You've been answering a

23   question that I didn't ask and it's been such a

24   long answer I can't remember my question.

25       A.    What was your question, sir?

```
 1              MR. DRLICKA:  Can you repeat the

 2       question?  Can you find it?  That one I can't

 3       remember because it's been so long ago.

 4              (Whereupon, the following question was

 5       read back by the court reporter:

 6              QUESTION:  When did you make this

 7         report to Pat Brown?

 8              THE WITNESS:  That was right after, so

 9       after this incident I went back to Ms. Pat

10       Brown and I started telling her that I felt

11       that there was something going on.  And then

12       right after this report, right after the

13       incident with Ms. Robin Bare, and then I went

14       back and told Ms. Pat Brown to please help me

15       with this because I don't understand what's

16       going on on the floor.  And then it was

17       just -- the situation became almost

18       unbearable.

19  BY MR. DRLICKA:

20       Q.     Did you tell Ms. Brown anything else

21  other than you felt something was going on on the

22  floor that you didn't understand?

23       A.     I feel I -- if I remember well, I would

24  have to review my note on that meeting what exactly

25  happened, but I definitely told her that I was
```

1    treated in a way that I did not deserve to be

2    treated and I felt like she was treating me

3    differently than the other people.   And I

4    reported -- I reported all these incidents that was

5    happening.   I reported all of these incidents that

6    was going on, and right after that --

7         Q.    Did you ever tell Ms. Brown that you

8    were being treated differently because of your race

9    or just that you were being treated differently?

10        A.    I believe I did report that in so many

11   words.   It's --

12        Q.    It's a simple question, yes or no.   Did

13   you or did you not?

14        A.    I told Ms. Brown that I felt that I was

15   treated differently.

16        Q.    Did you tell Ms. Brown that you felt you

17   were being treated differently because of your

18   race, yes or no?

19        A.    I don't remember.   At this time I do not

20   remember.   I would have to review my note.

21        Q.    And you agree, going back to that

22   November 7th letter, you told the Florida

23   Commission on Human Relations that you never

24   reported race discrimination?

25        A.    I wrote that.

                    MS. CRUZ:   Object to the form.   Go
          ahead.

BY MR. DRLICKA:

     Q.     When was this meeting with Robin Bare,
Pat Brown, Jeane Gambino and yourself?

     A.     I don't remember the date.

     Q.     Do you recall the month?

     A.     It was about two weeks after the
incident.   I don't remember the month.

     Q.     Do you recall -- if I told you it was
February 26th, does that sound about right, 2010?
And if you don't recall, that's fine.   I don't want
to put words in your mouth.

     A.     Un-huh.

     Q.     No, you don't recall?

     A.     I don't recall.

     Q.     Do you recall when the meeting was with
Pat Brown, how long after was -- strike that.
That's going to be a terrible question.

            How long after your meeting with Robin
Bare, Pat Brown and Jeane Gambino was your meeting
simply between yourself and Pat Brown?

     A.     I don't remember again the date, but I
think it took about two weeks because that's about
what it took for Ms. Gambino to answer me.

66

1    Q.    Going back to Exhibit 11, in that

2    sentence where you said that you did not report any

3    discrimination, you also said I felt discriminated

4    against.  What discrimination are you referring to

5    in this letter of November 7th that's marked as

6    Exhibit Number 11?

7    A.    I was the only black Coordinator nurse

8    on the floor and I felt I was being treated

9    differently because of the way when I reported

10   something that the response or the non-response

11   compared to other response, I felt, and the

12   relation she had with the other staff.

13   Q.    You would agree that people often treat

14   other people differently, correct?

15        MS. CRUZ:  Object to the form.

16   BY MR. DRLICKA:

17   Q.    I mean, you don't treat your children

18   the same way, do you?

19   A.    I do.

20   Q.    Exactly the same way a hundred percent

21   of the time?

22   A.    They have different personalities, but I

23   do.

24   Q.    That's what I'm getting at.  You

25   recognize that there's different personalities?

MARY BRIGMAN, COURT REPORTER

1          A.       Yes, I do.

2          Q.       And you recognize that people have

3    different friends?

4          A.       Yes.

5          Q.       And some friendships are stronger than

6    others?

7          A.       Uh-huh, I understand that.

8          Q.       So there's -- would you agree that

9    there's a number of reasons why one person may

10   treat somebody one way and another person another

11   way other than discrimination?

12         A.       In the work situation, no, I don't, sir.

13         Q.       You don't?  You don't recognize that

14   people could be -- co-workers could be friends and

15   that they may be treating their friend one way

16   because of their friendship and somebody who

17   they're not friends with a different way because of

18   the friendship with the one co-worker?

19         A.       What friendship has to do at work?

20         Q.       So you don't recognize that -- I

21   understand, but you don't recognize that people

22   could be treated differently because of, for

23   example, a friendship?

24         A.       I believe people should be treated the

25   way they perform and I felt like I was treated

1    differently.  And other than my color and my race

2    and my accent, I don't see what would be the other

3    reason why I was treated differently.

4         Q.    But you recognize that there could be

5    other reasons?

6              MS. CRUZ:  Object to the form.

7    BY MR. DRLICKA:

8         Q.    For example, friendship.

9         A.    I'm not sure I know how to answer this

10   question.  For sure when you're friends with

11   someone you're going to have more attraction to

12   that person and more understanding to that person,

13   but I don't understand.  I don't understand your

14   question, sir.

15        Q.    My question is just very simple, because

16   I want to make sure I understand you.  Every time

17   you think that somebody is being treated

18   differently it has to do with their race?

19        A.    This is my -- I have never had to report

20   someone for race.

21        Q.    Not my question.  My question is simple.

22   Do you believe that every time somebody is being

23   treated differently it's because of their race?

24        A.    No.  Sometimes it's for other reasons.

25        Q.    And that's what I'm getting at.  What

1    are other reasons that you can think of for why
2    somebody treats a person one way and another person
3    another way?  Just give me some examples of where
4    you would think that that would occur.
5        A.    Well, if you don't like the person, if
6    you don't like the person for whatever reason,
7    whatever you believe this person is.
8        Q.    And that could be because of something
9    other than race that you don't like a person?
10       A.    It can be, it can be for something else
11   than race.
12       Q.    So do you know why -- I know what you
13   believe.  My question is do you know why you were
14   treated differently or you believe you were treated
15   differently?
16       A.    I believe -- I believe that Jeane just
17   did not like me for whatever reason, whatever
18   reason.  And the only reason that I can think of is
19   my accent, the way I talk.  I talk very differently
20   than any other people on the floor, my color and my
21   race.
22       Q.    And I understand your belief and I
23   understand that you believe that.  My question is a
24   little bit different.  Do you have any facts to
25   support your belief that you're being treated

70

1    differently because of your race versus something

2    else?

3         A.    The fact is the way I felt inside.  In

4    ten years at Sacred Heart I have not felt that

5    strongly that someone did not like me for that

6    reason.

7         Q.    And I understand that that is your

8    belief.

9         A.    And that is my fact also.

10        Q.    Do you have any other facts to support

11   your claim you were treated differently because of

12   your race other than your own subjective belief

13   that it had to be because of my race?

14        A.    There was two situations on the floor

15   that happened.  The first one is there was a black

16   CNA tech -- CNA or tech, who called the hot line

17   and reported the way Jeane was treating her.  And

18   Jeane came at the nursing station and she told

19   people about the entire situation.  So that, and

20   Beverly was black.

21             And there was another case where the

22   nurse was allegedly using some narcotic, which

23   again was some private information, confidential

24   information, and Jeane shared open that information

25   to everybody.  And in those two cases it happened

1    to be that Alba was a Latino and Beverly was black.

2        Q.      Okay, so going back to beyond --

3        A.      So those would be my facts, sir.

4        Q.      Well, help me out because I'm trying to

5    understand it.

6        A.      Uh-huh.

7        Q.      I understand your belief.

8        A.      Uh-huh.

9        Q.      That's one thing.

10       A.      Uh-huh.

11       Q.      Facts are another thing, you would

12   agree?

13       A.      Uh-huh.

14       Q.      You need to answer out loud.

15       A.      Yes.

16       Q.      The nurse that you allege was using

17   narcotics is a Latina, so how does that support

18   your claim that you were being treated differently

19   because you're African-American or black?

20       A.      Because of my race.  I am different than

21   her.  Alba was different than her and Beverly was

22   different than her.  And in those three -- and in

23   those two cases I felt like she made a joke of it.

24   It is not a joke when someone is using narcotics.

25       Q.      From what I heard you say earlier, you

1    just said what she did was after these two

2    incidents came to light she just told everybody

3    about them.

4         A.    Uh-huh.

5         Q.    Now you're saying she was joking about

6    it.  Which one is it?

7         A.    It was the way she was talking about it.

8    It felt like she was --

9         Q.    What was the way she was talking about

10   each of the incidents?

11        A.    Just talking about it, just talking

12   about it at the nursing desk, just talking about it

13   in the meeting, that was a joke.  You do not do

14   things like that.  You do not do that.

15        Q.    What, you don't talk about it?

16        A.    You showed me one of your documents

17   about being private and so to me, to me, what

18   Sacred Heart had instructed us was a violation.

19        Q.    A violation of what?

20        A.    A violation of talking about the

21   incident.  And I was wondering if it was a white

22   nurse would she have done the same thing.

23        Q.    Did she not talk about things that white

24   nurses did?

25        A.    I just gave you -- you asked me for two

1    examples with a black person and I give you those

2    two examples.

3         Q.     Well, one was Latina.  You only gave me

4    one example of an African-American.

5         A.     Latino, black, a difference race.

6         Q.     My question, though, now is did she ever

7    talk about white nurses?

8         A.     I don't recall.  I don't recall her

9    talking.

10        Q.     When you say you don't recall, does that

11   mean she did not or you don't remember?

12        A.     I don't remember.

13        Q.     You made a statement earlier that you

14   believe that Jeane was passing information on to

15   Robin Bare that she raised at this meeting that you

16   had with Jeane Gambino and Pat Brown concerning the

17   incident where Robin Bare yelled at you.

18        A.     Uh-huh.

19        Q.     What evidence do you have, what facts do

20   you have to support your allegation that Jeane

21   Gambino was passing the information to Robin Bare

22   that she was discussing at this meeting?

23        A.     I did not know about this situation at

24   all, so when Robin Bare told me that, I -- and then

25   Jeane did not respond to it, then I started sending

1  e-mails asking her to please let me know what she
2  was talking about, she never said, Regine, I never
3  said that to Robin Bare.  In fact, she did send
4  me -- she did send me a copy of the paper she
5  believed that I had forged a nurse name.  And so to
6  me it became, so how I don't know about this
7  situation but how come Robin Bare knew about this
8  situation.

9      Q.    Here's my question again.  What facts do
10 you have to support that Jeane Gambino actually
11 provided information to Robin Bare?

12     A.    Jeane was the -- is the manager on the
13 floor.  Other than coming from her, I don't see who
14 else would have.

15     Q.    I understand you're saying that you
16 don't see who else would.  My question is more
17 direct.  What facts do you have to support that
18 Jeane Gambino actually gave information to Robin
19 Bare?

20     A.    I don't have any facts, other than --
21 other than --

22     Q.    Your belief?

23     A.    Other than my belief and then the
24 situation that was reported that she knew about it,
25 she had to believe that I had forged -- Jeane also,

75

1   the same as Robin, both of them believed that I had

2   forged a name.

3       Q.    And why isn't it that Robin Bare was the

4   one that told Jeane Gambino about that document?

5       A.    Because I believe in one -- one of the

6   responses that she sent to the Florida Commission

7   she stated that we -- oh, boy, I need to review

8   those documents, but if I remember well, she stated

9   that we had a meeting about this.  We had a meeting

10  about this and we never had a meeting about this.

11  I didn't know nothing about it.

12      Q.    How certain are you that there was no

13  meeting?

14      A.    I am a hundred percent sure that there

15  was no meeting.

16      Q.    And if Jeane Gambino has notes of that

17  meeting --

18      A.    Uh-huh.

19      Q.    -- how do you explain it?

20      A.    She would have to explain that.  I

21  cannot explain that for her.

22      Q.    Could it be that there was a meeting and

23  you just simply don't remember it?

24      A.    No, I think that was made up.  She lied.

25  I think that's what happened.  She lied saying that

```
1     she had a meeting about this with me.  And
2     something that serious I believe should have been
3     followed up through, that a nurse forging
4     information, forging signature, that should have
5     been a serious meeting on paper.
6           Q.      In your opinion.
7           A.      So I would have remembered that, sir.
8           Q.      And we'll get to those.
9           A.      Uh-huh.
10          Q.      Now going back, other than these two
11    incidents, do you have any other facts -- and your
12    belief, do you have any other facts to support that
13    you were being treated differently because of your
14    race versus some other reason?
15          A.      I don't recall any specific at this
16    time.  Can I -- I'm sorry.
17          Q.      Go ahead.
18          A.      Can I go back?
19          Q.      Absolutely.
20          A.      No, that would not be a specific to
21    my --
22          Q.      Absolutely.  And I should have told
23    you --
24          A.      I'm sorry, that would not be specific to
25    my race.
```

1     A.     I do not recall any at this time, sir.

2     Q.     And the reason why I am asking that is

3   because this is my opportunity to ask you the

4   entire basis for your claim of being treated

5   differently and I don't want to be surprised that

6   after we leave today you come up with other

7   examples.

8     A.     I don't remember anything -- or any

9   other one at this time.

10     Q.     And do you feel fairly confident that

11   had there been others you would have included it in

12   your Complaint that's marked as Exhibit 12?  You

13   wouldn't leave anything out?

14     A.     I did report what I remembered.  If I --

15   at this time I don't remember.  If someone said

16   something that flashed something, I might recall

17   something else.

18     Q.     But as we sit here today, these are the

19   only ones that you remember that are listed in

20   paragraphs seven through eleven of Exhibit 12?

21     A.     Uh-huh, yes, sir.

22     Q.     Now going to -- let's go specifically to

23   paragraph seven.

24     A.     Uh-huh.

25     Q.     Do you see that portion where you allege

1    Q.    And the paper that you are referring to

2    that Sacred Heart sent to the Florida Commission on

3    Human Relations involving this other incident where

4    Robin yelled at another co-worker, it was not

5    another Coordinator that she was yelling at.

6    A.    The example I just gave was not Robin.

7    That was Elizabeth Masoner who yelled at the

8    Coordinator.  And according to the paper that

9    Sacred Heart sent to the Florida Commission,

10   Ms. Masoner received a level two discipline action.

11   And I felt that she yelled, and that was not

12   supposed to be done, and Jeane took action against

13   that.  She reprimanded and gave a level two to

14   Elizabeth Masoner.

15        In my case, after this woman yelled at

16   me, we were in a meeting and you're going to say,

17   tell her I'm sorry?  That yelling situation was

18   done at the desk.  There was other staff and

19   possibly patients who heard all of that, sir, and I

20   felt that again it was a different treatment.

21   Q.    So let me ask you this.  Were you there

22   when Elizabeth Masoner allegedly yelled at Jennifer

23   June?

24   A.    I heard about it and I saw the fact on

25   the paper that Sacred Heart sent to -- and

86

1    Elizabeth Masoner herself told me about it.

2         Q.    Not my question.  Were you there?

3         A.    No, I was not.

4         Q.    So everything you heard about Elizabeth

5    Masoner's situation was from hearsay, through other

6    people, correct?

7         A.    Through Elizabeth Masoner and other

8    people, yes.

9         Q.    And do you know what was Elizabeth

10   Masoner's disciplinary history when this alleged

11   incident occurred between her and Jennifer June?

12        A.    I'm not sure.

13        Q.    Do you know who the supervisor was in

14   the Observation Unit when Elizabeth Masoner

15   received a, you say, level two counseling?

16        A.    Are you asking me who the manager was?

17        Q.    Yes.  Jeane Gambino wasn't there at the

18   time, was she?

19        A.    I don't remember.

20        Q.    Now, you indicated that you don't know

21   what Elizabeth Masoner's disciplinary history was

22   at the time of this incident.  Do you know what

23   Robin Bare's disciplinary history was at the time

24   of your incident?

25        A.    No.

1     A.     Uh-huh.

2     Q.     And when you answered these questions

3 did you understand you were answering them under

4 oath?

5     A.     Uh-huh.

6     Q.     You need to answer out loud.

7     A.     Yes.

8     Q.     Under the penalty of perjury?

9     A.     Yes, sir.

10     Q.     Why did you put that you were the only

11 one reprimanded when that's not true?

12     A.     To me, it's true.

13     MS. CRUZ:  Object to the form, but go

14     ahead and answer.

15     THE WITNESS:  To me, it is true.  To me,

16     this -- from this, everything was worse.  It

17     was a reprimand to me.

18 BY MR. DRLICKA:

19     Q.     How was it a reprimand?

20     A.     To me, it was a reprimand.  To me, it

21 was a joke.  Everybody knew about it.  Everybody

22 knew about it.  Robin was not suspended, and to me

23 it was a slap in the face.  It was humiliating and

24 it was a reprimand, sir.

25     Q.     Was it a reprimand in the sense that

106

1    to a reprimand of -- do you see that where it

2    indicates you were reprimanded?

3         A.    Uh-huh.

4         Q.    Are you referring to the June 25th

5    corrective action plan that you received?

6         A.    I received a disciplinary action.  I

7    don't remember the date.  And it did mention -- it

8    mentioned about the rounding.

9         Q.    Let me show you what's going to be

10   marked as Exhibit 15.

11        A.    Okay.

12        Q.    Let me show you what's been marked as

13   Exhibit 15.  Do you recognize Exhibit 15?

14        A.    I recognize it.

15        Q.    And on Exhibit 15 there appears to be

16   seven circumstances underlying this particular

17   corrective action and positive redirection plan?

18        A.    Uh-huh.

19        Q.    You need to answer out loud.

20        A.    Yes, sir.

21        Q.    Which of the seven incidents in

22   Exhibit 15 are you referring to in paragraph eight

23   of your Complaint?

24        A.    On number three it says 5/25/2010

25   Suzanne Rodgers, oncoming Coordinator, arrived at

1   0650 and began to make assignments.  She asked
2   Regine which patients needed a quick discharge so
3   that she could make the proper assignments.  Regine
4   informed Suzanne that report would be at 7:00, not
5   before.
6       Q.    Where in that paragraph three of
7   Exhibit 15 does it reference anything about
8   rounding?
9       A.    Rounding or report, we just said it
10  could be the same thing, right?
11      Q.    True, and where does it say that you're
12  being disciplined for not giving a report?
13      A.    It says describe in detail the
14  circumstances leading to this corrective action on
15  top here in the black.
16      Q.    But where in paragraph three does it say
17  that you are being disciplined for not rounding or
18  reporting?
19      A.    It's reported on the disciplinary
20  action.
21      Q.    Not my question.  In paragraph eight of
22  your Complaint you are saying that you were
23  disciplined for not reporting and we have
24  established that what you are referring to in
25  paragraph eight is Exhibit 15.

108

1      A.      Uh-huh.

2      Q.      Where in Exhibit 15 are you being

3   disciplined in paragraph three of Exhibit 15 for

4   failing to round or report?

5      A.      I am not sure I understand your

6   question.   This is a disciplinary action.

7      Q.      Correct.

8      A.      They have reported that part of this

9   disciplinary action is because that Regine did

10   not -- (reading from document) okay, Regine did

11   not -- so she could make the proper assignments,

12   Regine informed that she would not.

13            If it's mentioned on a disciplinary

14   action, it's because it was a problem.

15      Q.      That's not my question.   My question is

16   if you look at paragraph eight of your Complaint,

17   you're saying, quote, "When plaintiff did not meet

18   with Roger about rounding, she was reprimanded."

19            Show me in Exhibit 15 where you were

20   reprimanded for not rounding with Suzanne Rodgers.

21      A.      Right here.

22      Q.      Paragraph three?

23      A.      Paragraph three.

24      Q.      But paragraph three specifically says

25   that Ms. Rodgers was not asking for a report.   She

1    was just asking you one question.

2         A.    It's part of reporting.

3         Q.    That's not part of reporting.

4         A.    At 0650 most of the time I'll be trying

5    to finish and I am trying to finish my shift and at

6    7:00 it was we start --

7         Q.    Ms. Malebranche, using your definition

8    that you gave me earlier, that's not rounding what

9    you're being disciplined for.  Using your own

10   definition of rounding --

11        A.    Uh-huh.

12        Q.    -- she was simply asking you a question,

13   which you refused to answer until 7:00.

14        A.    Uh-huh.

15        Q.    So you were not being disciplined for

16   rounding.  You were being disciplined for

17   unprofessional behavior and refusing to answer a

18   simple question that was asked of you by Suzanne

19   Rodgers --

20        A.    It was part of the report to me.

21        Q.    -- correct?

22        MS. CRUZ:  Object to the form.  Go

23        ahead.

24        THE WITNESS:  It was part of the report

25        to me.  When we do rounding, we give our

1    verbal of the condition of the patient, who

2    can be discharged.  Asking who can be

3    discharged is part of the report.

4  BY MR. DRLICKA:

5      Q.    Why did you refuse to give it to her, to

6  answer one simple question for ten minutes?

7      A.    I don't remember exactly what happened

8  for me not to respond.  I have to believe that the

9  end of shift, the shift is usually very chaotic and

10  you're trying to finish and you're trying to close

11  your chart.  And I was trying to just have all my

12  information in place.  You have to collect all your

13  information so you can give an accurate report to

14  the oncoming nurse.

15      Q.    And the other reason why you were

16  disciplined is not only did you refuse to answer a

17  simple question that was being asked of you, but

18  you were acting in a rude and unprofessional manner

19  that day.

20      A.    I was not.

21          MS. CRUZ:  Object to the form.

22  BY MR. DRLICKA:

23      Q.    Then why would Shalanda Lewis say you

24  were?

25      A.    You would have to ask Shalanda that.  I

MARY BRIGMAN, COURT REPORTER

153

1      A.      I don't remember the medication.

2      Q.      And you don't recall whether it was an

3  error in the dosage, was it an error in when the

4  medication was given?  I'm trying to find out what

5  kind of error it is.

6      A.      I don't remember the detail or the

7  error.

8      Q.      And then your incident that you reported

9  and nobody got back with you, what was the

10 medication error?

11     A.      I had several.

12     Q.      What were the medication errors?

13     A.      I had a med that we are not giving at

14 the right time.  I had a med that was never

15 reported.  The nurse signed the MAR saying that the

16 MAR was accurate and the med was not on the MAR.  I

17 had a mistake where the patient was given the

18 medicine too early.  I had -- I definitely had a

19 mistake on the wrong time, wrong dosage, the

20 medicine not being there, and I can't remember all

21 of them.

22     Q.      So how is it that you can sit here under

23 oath and say that the situation with Jake Bush was

24 the same as what you reported?

25     A.      I did not say that it was the same.  I

154

1   said a med error.  It was -- I remember it was a

2   med error and I do know that I have reported med

3   errors.

4        Q.    I understand, but there are different

5   types of med errors, you would agree?

6        A.    I agree, uh-huh.

7        Q.    So how do you know that the med error

8   that he reported was similar in any way to the med

9   error that you reported?

10        A.    At this time I don't remember exactly

11   what it was, but I remember taking note of it so I

12   have that.  I have the note what it was.

13        Q.    Well, we've asked for that and did you

14   produce it?

15        A.    My notes?

16        Q.    Yes.

17        A.    No, I don't -- I didn't produce that.  I

18   remember it.  As I said, you're trying to ask me

19   the details and I can look back and I'm sure I'm

20   going to find little notes that's going to say what

21   was the mistake.

22        Q.    And that's what I -- we've moved on to

23   the notes.

24        A.    Uh-huh.

25        Q.    What notes are you talking about?